IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LARRY D. COOK,

        Plaintiff,

v.                                               Civil Action No. 3:05-CV-37

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.     Background

    Plaintiff, Larry D. Cook, (Claimant), filed his Complaint on April 27, 2005, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on August 2, 2005.[2]  Claimant filed his Motion for Summary Judgment and Memorandum in Support on August 31, 2005.[3]  Commissioner filed her Motion for Summary Judgment and Brief in Support on September 27, 2005.[4]

B.     The Pleadings

        1.     Claimant's Motion for Summary Judgment and Memorandum in Support.

        2.     Commissioner's Motion for Summary Judgment and Brief in Support.

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 9.

[4] Docket No. 10.

C.     Recommendation

       1.     I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ (1) properly evaluated and weighed the opinion of Claimant's treating physician; (2) properly evaluated and weighed the opinion of Mr. Morrello, a consulting psychologist; and (3) properly considered Claimant's obesity.

## II. Facts

A.     Procedural History

    On November 20, 2002, Claimant filed for Disability Insurance Benefits (DIB) alleging disability since November 11, 2002. The application was denied initially and on reconsideration. A hearing was held on February 11, 2004 before an ALJ. The ALJ's decision, dated May 6, 2004, denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on March 17, 2005. This action was filed and proceeded as set forth above.

B.     Personal History

    Claimant was 49 years old on the date of the February 11, 2004 hearing before the ALJ. Claimant has a high school education and past relevant work experience as a pipe layer, iron worker, and carpenter.

C.     Medical History

    The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: November 1, 2002--May 6, 2004.

**Dr. Sabio, Internal Medicine Consultative Examination, 2/26/03, Tr. 135-139**
Diagnostic Impression: Uncontrolled diabetes mellitus type II, hypertensive cardiovascular

disease controlled, diabetic neuropathy, peripheral arterial insufficiency and history of bronchial asthma and hyperlipidemia.

**Physical Residual Functional Capacity Assessment, 3/19/03, Tr. 140-147**
Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., sit 6 of 8 hours, unlimited push and pull.

Postural limitations: None established.

Manipulative limitations: None established.

Visual limitations:  None established.

Communicative limitations: None established.

Environmental limitations: None established.

**Physical Residual Functional Capacity Assessment, 6/11/03, Tr. 148-155**
Exertional limitations: Occasionally 50 lbs., frequently 25 lbs., sit 6 of 8 hours, unlimited push and pull.

Postural limitations: None established.

Manipulative limitations: None established.

Visual limitations:  None established.

Communicative limitations: None established.

Environmental limitations: hazards, avoid concentrated exposure.

**Dr. Sabio, 7/11/03-11/13/03, Tr.156-161**
Diagnosis: diabetic neuropathy.

**Dr. Sabio, 8/5/03-11/4/03, Tr. 119-234**
Diagnosis: DM/2 uncontrolled, ruptured lumbar disc L4-L5.

**Braxton County Memorial Hospital, Tr. 232**
Impression: 1. Small central L4-5 disc rupture without significant neurall foraminal narrowing.
           2.  Multiple levels of disc degeneration and bulge without other focal disc ruptures.

**Michael D. Morrello, MS, Psychological Evaluation, 12/30/03, Tr. 235-240**
Diagnostic Impression:
Axis I:                 Major depressive disorder, single episode, with psychotic features;

|           |                                                                        |
|-----------|------------------------------------------------------------------------|
|           | generalized anxiety disorder.                                          |
| Axis II:  | Borderline intellectual functioning;                                   |
| Axis III: | By patient report: diabetes, hypertension, arthritis, neuropathy, asthma and cholesterol. |
| Axis IV:  | Economic problems: no financial income                                 |
|           | Vocational problems: unemployed.                                       |
| Axis V:   | 50.                                                                    |

## Michael Morrello, MS, Mental Residual Functional Capacity Assessment, 1/21/2004, Tr. 241-245

| | |
|---|---|
| SLIGHTLY LIMITED: | the ability to understand and remember short, simple instructions; carry out short, simple instructions; sustaining attention and concentration for extended periods; maintaining acceptable standards of grooming and hygiene; to be aware of normal hazards and take appropriate precautions; traveling independently in unfamiliar places. |
| MODERATELY LIMITED: | the ability to understand and remember detailed instructions; carry out detailed instructions; exercise judgment or make simple work-related decisions; maintaining regular attendance and punctuality; completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace; responding appropriately to direction and criticism from supervisors; working in co-ordination with others without being unduly distracted by them; maintaining acceptable standards of courtesy and behavior; relating predictably in social situations in the workplace without exhibiting behavioral extremes; demonstrating reliability; ability to ask simple questions or request assistance from coworkers and supervisors; ability to respond to changes in the work setting or work processes; setting realistic goals and making plans independently of others; ability to tolerate ordinary work stress |
| MARKEDLY LIMITED: | Interacting appropriately with the public; working in co-ordination with others without unduly distracting them. |

## Michael D. Morrello, MS, Psychiatric Review Technique Form, 1/28/04, Tr. 246-259

Affective Disorders
    Disturbance of mood: depressive syndrome (anhedonia, decreased energy; thoughts of
    suicide, hallucinations, delusions or paranoid thinking).

Anxiety-Related Disorders
    Generalized persistent anxiety (motor tension, autonomic hyperactivity, apprehensive
    expectation).

Rating of Functional Limitations
> Marked:      restriction of activities of daily living, difficulties in maintaining social functioning;

> Moderate:    difficulties in maintaining concentration, persistence, or pace;

> Repeated episodes of decompensation:      one or two;

"C" Criteria of the Listings
> Medically documented history of:    a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be precluded to cause the individual to decompensate.

**Dr. Sabio, RFC, 2/11/04, Tr. 260-266**
Impairments: AODM, diabetic neuropathy, HCVD, HTN, PAD, blood sugar level up and down, low back pain. neck and shoulder pain. face burns, sinus trouble, degenerative disc disease, GERD,

D.    Testimonial Evidence

1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 284-319):

Q      And what are your worst problems with the diabetes?  I mean, what symptoms do you have that have made it - - made you feel that you can't work?

A      Well, I hurt in my feet and my legs.  My feet, they get sore. I can't walk.  Another problem I think I've got is just like during the day it can go sky high and mess me up, or it can drop down low.  I got to start eating sweets to get it back up.  Just things like that.

Q      All right.  Well, let me ask you first about physical pain.  Where in your body do you have physical pain?

A      My feet, my legs.  It was the lower part of my legs.  Now it's moving into the

upper part of my legs.  I don't know if it's from the diabetes or not, but my back, it hurts.  I guess it's from that ruptured disc and stuff like that, you know.

Q     Right.  And how about your - - start from the top of your head and work down. Do you have any problems with your head, your neck, your shoulders?

A     Well, I hurt some in the neck and stuff, and I hurt some in the arms and stuff too. So I mean, you know, I get - - I have problems with my fingers and stuff getting sore and stuff, and he said it was arthritis.   I hurt in my arms, I hurt in my wrists.  I take times where my elbows get sore and I can't - - you know, just like a gallon of milk sitting in the sink, the kids' sink, I can't pick a gallon of milk up because of my elbows.

Q     Okay, all right, well, let's sort of divide those up a little bit, and I'm going to ask you separately.

A     Okay.

Q     Now let's talk about first your feet and your legs.  Are you limited in any way by the pain that you've described?  What can you do and what can't you do?

A     Well, there's days I can call - - what I call piddle work.   And then there's day they hurt, and they're so sore that I lay in bed most of the day.

Q     All right.

A     I mean, I may lay in the bed some days five and six hours at a time.  I mean, there's times it hurts my feet when I put a pair of socks on.  They're sore.

Q     Okay.  Have you had any infections in your feet?

A     I've had one infection.  I come on the side of my toe.  It's been a couple years ago.  It just come out of the blue, a big infected spot.  He give me antibiotics for it and it cleared

up.

      Q      All right, so are you  - - do you take particular care with your feet?

      A      Yes, I do.  He told me to make sure I take care of my feet.  He said that was one of the first places to get - - you know, that something will happen.  And I look at them every night when I wash, take a shower and stuff.  I look them good every night.

      Q      All right.  Now you indicated that the pain was in your legs as well as your feet, and you said the pain has moved into the upper parts of your leg?

      A      Yeah.  I know there's - - I take a spell with this leg here now, my right leg, where it'll get just as numb and deader - - just as dead as ever and numb.

      Q      Is that different from the way your feet feel?

      A      I think so.  My feet don't get what you call numb.  They get sore and they hurt.

      Q      Okay.  Now you've kind of described symptoms that fluctuate.  They come and they go.  Could you tell me, for instance, in a normal week or a normal month how many days that you would have that your feet were sore enough that they would have some impact on your ability to walk?

      A      Well, there's days maybe that my feet ain't what you call sore.  And I may go out and what I call like piddle, like be out in the yard and stuff like that.  And I don't know if it's where I'm on my feet or what, but my feet will get sore after that.

      Q      All right.  Well - -

      A      And then there's times I can get up of a morning and my feet, they're sore. There's times where they're extra sore.  Sometimes they're just like tender like.

      Q      Okay, well, on - - let's talk about a good day and a bad day, all right?  Let's say a

good day. On a good day when you're doing reasonably well, are you limited in the amount of time you can stand and walk?

A      Yeah. And you know, on what I call a good day is a day that I can get out to the post office and maybe go to the drug store. But still, you know, I still favor my - - if I'm like washing dishes, about every 10 or 15 minutes, sometimes is as long as I can stand on my feet.

Q      Now is that a good day or a bad day?

A      That's probably, to me, is a good day. Because there's some days that I lay in bed five and six hours. To me, that's a bad day.

Q      Okay, so you're saying that even on your good days you're limited in - -

A      Yeah, on my good day - - yeah. I mean, to me, I've got better days, but to me, a good day I'm still limited.

                              *              *              *

A      On bad days, I mean there's days I lay in the bed and I've got to hobble on the side of my feet to go to the bathroom.

Q      Okay. Now when you say hobble on the sides of your feet, what do you mean?

A      That means like putting my feet down like this and trying to walk on the side of them to get rid of some of the pain instead of walking flat on my feet.

Q      All right. Judge, he demonstrated that he's turning his ankles in, walking kind of - -

A      That's when they're real sore and stuff.

Q      - - on the outside - - well, it is the very bottom of - -

A      It's like more the bottom that gets sore and hurts.

8

Q        Okay, all right, so - -

A        I mean, it still hurts, I mean I walk up on the side of them of them, but it's not like walking right on the flat of my feet.

*                    *                    *

Q        All right, now you've told us that you have a herniated disc in your back, and you mentioned leg pain that you thought might be related to that.  Which leg is affected or are both affected?

A        My right leg.

Q        All right.  Tell me about that.  That's when it goes, you said, just dead?

A        Yeah, when I have spells with that - - now there's times that when I like to go to the bathroom to pee, I can't stand long enough to pee.  I've got to sit on the commode to pee.  And I don't have a bathtub in my house.  I've just got like a shower stall, and when I go to take a shower when I'm in that - - when that - - that's working on me, I've got to sit on a stool in my shower to take a shower.

Q        Okay.  And that's primarily due to the soreness of your feet or the problem with your -  A        That part there is from the ruptured disc.  He said it was ruptured disc.  When that part there happens, that's from that ruptured disc in my back.

Q        All right, and does the disc have any impact on you if you're just sitting still?

A        Well, I don't know what - - now when I'm just sitting like this here, I don't know if it's from the disc or what.  But after I sit a period of time, I start hurting real, real bad in my hips and my legs, and I start getting numb.  And then I've got to get up and move around and stuff like that.  I'm not going to say if that's caused by my diabetes or my disc in my back.

9

Q        All right.  But you're just generally limited.  Now you're sitting with your knees

spread out real wide, and you're kind of sitting on the edge of your chair.

A        Right.

Q        Is - -

A        It's more comfortable sitting like this.

Q        Okay.  And you've got - - you're kind of leaning on the table.  Is that just

convenient or are you leaning there on purpose?

A        I'm just - - to me, I'm comfortable sitting and leaning like this.

                        *                *                *

A        Just like I'm sitting right here, probably it's about an hour before I start hurting.

In my legs and my hip I'll hurt like that.  I don't know if it's the position, because I'm sitting.

Then I've got to get up and ease around and stuff.

                        *                *                *

A        Like gripping I do.  I mean, when I grip like that - - when I grip, I ain't got much

grip.  When I grip, especially this hand, it hurts.  I mean there's - - you squeeze it a little bit, it's

sore.  I mean, I've got knots and everything and stuff like that.  And he says that's rheumatism.

Q        All right, that's your left hand?

A        Um-hum.

Q        Now does that vary?

A        Yeah.

Q        All right.  Tell me, what's the difference between a good and a bad day using

your hands.  Let's talk about, for instance, dishes, and do you do cooking for yourself? You fix

your own -     A     Well, I do some cooking, but most of the time my sister fixes me meals and brings them to me.

                                        *               *               *

A     But if I'm going to get milk out of the refrigerator, I would use my right hand, which I'm right-handed anyway, instead of my left because I really don't have no grip in my left hand.  I've got grip in my right hand, but my right elbow's messed up.  But my elbow on my left hand is not messed up, but my wrist and my hand is.

Q     Okay, so it's your left and wrist and your right elbow - -

A     Right.

Q     - - that gives your problems?

A     And he says it's from rheumatism.

                                        *               *               *

Q     Okay, is that - - you mentioned you weren't on your feet very much.  Is that something you know you have, but it doesn't really bother you?

A     I don't know if the varicose veins - - I mean, you know, if that's got anything to do or not with the stinging in my legs or what.  But I think the stinging in my legs has got to do with that name - - some kind of name he calls where the diabetes is killing the nerves and stuff in my legs, what the name of that is.

Q     That's the kind of pain you have is stinging?

A     I have stinging pain and stuff like that too.

Q     Okay.

A     Just feels a lot like - - seems like bee stings.

Q        How often do you have that problem?

A        Quite a bit.

Q        Every day or - -

A        Every day.  I have bee stings in my legs every day.

Q        All right.  How's your breathing?

A        Sometimes seems like I'm short of breath.

                              *            *            *

Q        Okay, all right, are you - - have you noticed whether or not, if you're around any particular substances or odors or anything like that, whether it has any impact on your breathing or -     A        Oh, yeah.  I mean, it's just like my sister, when she mops or something like the linoleum floor, the detergent she uses, you know, ever what she uses, it bothers me.  Stuff like that.

Q        Well, how badly does it bother you?  Do you have to leave or can you tolerate it?

A        I can tolerate it, so I can.  But I don't have to leave the house, no.

                              *            *            *

Q        Okay.  As far as your postures, you have any difficulty just bending over?

A        Seems like I do anymore.  Used to be I didn't, but I do anymore.

Q        As far as putting your shoes on - -

A        Yeah.  I think a lot of that's got to do with my overweightness too.

Q        Are you saying that that is difficult for you?

A        Yeah.

Q        Can you do it?  Can you put them on and tie them yourself?

A        I got to put them up on a stool or something.  I can't bend over and do it.  But since I've got my diabetes which has been like seven years - - when I got my diabetes I weighed 200 pounds.  Now I weigh like 275 pounds.  275 pounds is a lot of weight you've gained when you're not used to it.

Q        Do you have any difficulty wearing shoes and socks?

A        I don't have them on today, but most of the time I got - - my sister got me some diabetic socks.  I use them but they don't seem like they help.  But like I say, there's days my feet are sore that it hurts when I put on a pair of socks, when my feet are sore that it hurts when I put on a pair of socks, when my feet and toes are sore.  And I won't even put on socks.  And like if I'm laying on the bed and I push my feet down underneath the bed, like my feet - - it hurts my toes and stuff just pushing it underneath the sheets.  There's days I can't wear socks and shoes.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 319-325):

Q        Would you please describe Mr. Cook's past work?

A        His work as a carpenter and laborer, construction, is heavy and unskilled.  He also worked as an iron worker, heavy to very heavy, and unskilled.  And a pipe layer heavy to very heavy and unskilled.

Q        Please assume a younger individual with a high school education.  Precluded from performing all but sedentary work with a sit-stand option.  Only occasional posturals.  No climbing, no hazards.  You take - - you said you take an asthma medication, Mr. Cook or not? I'm sorry.

CLMT          I've got asthma but I don't take no - - unless you call that Clarinet with my breathing part of it.

ALJ           Is that over-the-counter or - -

CLMT          No, he - -

ALJ           Is that a prescription?

CLMT          It's prescription.

ALJ           Okay.  It's probably Clarinex.

BY ADMINISTRATIVE LAW JUDGE:

Q          In a clean air environment.  No operation of foot pedals.  No temperature extremes.  And unskilled with low stress, defined as one- and two-step processes, routine and repetitive tasks, primarily working with things rather than people, entry level.  The hypothetical is sedentary, sit-stand, only occasional posturals, no climbing or hazards, clean air, no foot pedals, no temperature  extremes, and low stress.  With those limitations, sir, can you describe any work this hypothetical individual can perform?

A          Yes, Your Honor.  At the sedentary level the hypothetical individual I believe can function as a general office clerk, sedentary.  299,000 nationally, 2,900 regionally.  The region's West Virginia, Eastern Ohio, Western Pennsylvania, and Western Maryland.  Or a machine tender, sedentary.  141,000 nationally, 1,400 regionally.

Q          Are those jobs consistent with the DOT?

A          Yes, Your Honor.

Q          Mr. Beall, those jobs - - I'm referring to an RFC of Dr. Savvio (sic) in Exhibit 15F received today.  He indicated the Claimant would need to change positions every hour.

Would they allow for - - with the sit-stand limitation I gave you, would they allow for at least that amount of change of position?

A        For like brief periods of time?

Q        He doesn't say, but let's assume - - let's see, what he wrote in Exhibit 15F, Page 3, he can sit at one time for one hour.  And that's all he said at that.  So let's assume for a brief period of time, less than five minutes.

A        Yeah, those jobs would allow for that.

Q        He also - - second hypothetical.  Dr. Savvio (sic) also stated Mr. Cook would need to recline or lie down during the day with his feet up.  And also have frequent rest periods.  With those two combination of limitations - - feet up and frequent rest periods - - do those jobs accommodate that, in your experience?

A        No, Your Honor.

[TAPE #2]

ALJ     We're on Tape 2 of the Larry Cook case.

BY ADMINISTRATIVE LAW JUDGE:

Q        I was asking Mr. Bell, if I added Dr. Savvio's (sic) assessment in Exhibit 15F, Page 3, numbers 15 and 16, questions 15 and 16, lying down and frequent rest periods.  Mr. Bell's answer was those jobs would be eliminated.  Is that correct, Mr. Bell?

A        That's correct.

Q        If Mr. Cook's pain, sir, was so severe that he could not stay on task one third to two thirds of the day, are those jobs eliminated?

A        Yes, Your Honor.

Q        Do they - - the jobs you names in hypothetical one, and I'm referring to Dr.

Savvio's Exhibit 15F, question number 26 on Page 5.  Can the Claimant use his - - can the

patient use his feet and legs for pushing and pulling of leg and foot controls?  I believe I

indicated no foot pedals.  But is that also - - is that still consistent with your answer to

hypothetical one, if the Claimant can't use his legs for pushing and pulling?

A        Yeah, that wouldn't affect either of those jobs, Your Honor.

ALJ        Okay.  Ms. Van Nostrand?

ATTY        This gentleman because of his irritability and emotional - - I'm going to

call it emotional liability - - would be markedly impaired in dealing with the public, that's up to

two thirds of the workday.  And moderately in dealing with coworkers without distracting them.

And about half the time would be prone to emote in such a way that it would be considered

unacceptable in the workplace.  I'm wondering, in your hypothetical jobs, whether or not the

difficulties dealing with the public or dealing with coworkers would have an impact on the jobs

that you mentioned?

A        The public wouldn't be a problem.  But if two thirds of the time he's having

trouble and is distracting the coworkers, and half of the time he's behaving emotionally in an

unacceptable way, I don't believe that would allow for a competitive work routine.

Q        Okay.  Actually, distracting them is two thirds of the time, and being distracted by

them is about half the time.  So basically same answer?

A        Wouldn't change.

Q        Yeah, okay.  And I think you've already answered the question about attention

and concentration for one third to two thirds of the workday.   I'm going to say one third to one

half of the workday.

A       No change.

Q       No change, all right. Could I have the DOT numbers of the jobs that you identified, or exemplary DOT numbers?

A       Machine tender, for example, 739 685 054. General office clerk 209 587 010.

ATTY       Okay, now let's see if there's any other thing. Judge, could we just have him just scan the MRFC form from Cardinal Psychological Services. I think you've given all the major portions of the - -

ALJ       Okay, now my hypothetical was staying on task, and then you gave additional ones. So marked - - for example, marked in the public, you talked about.

ATTY       We talked about that.

ALJ       Concentration. Coordination with others, I think you alluded to.

ATTY       Detailed, we didn't discuss that.

ALJ       So I think even the - - I believe with Mr. Bell's testimony that - - when you asked about working in coordination with others, Exhibit 15F, Page 3 - - alone ruled out - -

ATTY       Rule them out. Well, we won't go into - - no need to  - - okay. All right.

E.      <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life.

•      Does the dishes. (Tr. 296, 304).

•      Goes to the post office.  (Tr. 296).

- Can stand, 10-15 minutes.  (Tr. 296).

- Can walk for an hour on a "good day."  (Tr. 297).

- Can get out for 3-4 minutes on an "excellent day." (Tr. 298).

- Can sit, 1 hour.  (Tr. 301).

- Able to drive.  (Tr. 301).

- Watches television.  (Tr. 302).

- Naps.  (Tr. 302).

- Can pick up a gallon of milk.  (Tr. 303).

- Uses no cane or back brace.  (Tr. 313).

- "Road hunts."  (Tr. 313).

- Deer hunts.  (Tr. 314).

- Does some housework.  (Tr. 317).

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) by failing to properly evaluate and weigh the opinion of Dr. Sabio, Claimant's treating physician; (2) by  failing to properly evaluate and weigh the psychological report of Mr. Morrello; and (3) by failing to consider obesity as a severe impairment.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ (1) properly evaluated and weighed Dr. Sabio's opinion;   (2) properly evaluated and weighed the opinion of Mr. Morrello; and (3) properly

evaluated obesity.

B.     The Standards.

1.     Summary Judgment.     Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.     Judicial Review.     Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.     Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.     Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.  <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her

impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

1. FAILURE TO PROPERLY EVALUATE AND WEIGH THE OPINION OF CLAIMANT'S TREATING PHYSICIAN.

Claimant maintains that the ALJ erred by failing to properly evaluate and weigh the opinion of Dr. Sabio, Claimant's treating physician. Commissioner counters that the ALJ properly evaluated Dr. Sabio's opinion.

The opinion of Claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984). Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

While the credibility of the opinions of the treating physician is entitled to great weight, it

will be disregarded if there is persuasive contradictory evidence. <u>Evans v. Heckler</u>, 734 F.2d

1012 (4th Cir. 1984). To decide whether the impairment is adequately supported by medical

evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated

by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3);

<u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); 20 C.F.R. §§ 404.1508; <u>Throckmorton v. U.S.</u>

<u>Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1. (4th Cir. 1990). Courts evaluate and

weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician

has examined the applicant; (2) the treatment relationship between the physician and the

applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with

the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts

often accord "greater weight to the testimony of a treating physician" because the treating

physician has necessarily examined the applicant and has a treatment relationship with the

applicant. <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001).

     In reviewing the decision of the ALJ, the Court's task is limited to determining whether

the ALJ's factual findings are supported by substantial evidence. <u>Hays v. Sullivan</u>, 907 F.2d

1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of

the Commissioner are supported by substantial evidence and whether the correct law was applied,

not to substitute the Court's judgment for that of the Commissioner. <u>Id</u>. Weighing conflicting

evidence from medical experts is exactly what the ALJ is required to do. <u>See</u> <u>Books v. Chater</u>,

91 F3d 972, 979 (7th Cir. 1996)(pointing out that when assessing conflicting medical evidence

from medical experts, an ALJ must decide, based on several considerations, which doctor to

believe).

All medical opinions are to be considered in determining the disability status of a claimants. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Social Security Ruling (SSR) 96-5p at *3. The ALJ undertook such an analysis here.

The Court's review of the record reveals that the ALJ reasonably resolved all such conflicts and that the record more than adequately bears out his conclusions.

In this case, the ALJ summarized almost the entire medical record before him (Tr. 22) and accepted Dr. Sabio's opinion to the extent that it was consistent with Dr. Sabio's own physical examination findings and the other substantive evidence of record. (Tr. 23-28). The ALJ, however, declined to accept all of the work related limitations endorsed by Dr. Sabio because they were inconsistent with Dr. Sabio's own clinical findings. (Tr. 28). For example, in his consultative examination performed in February 2003, Dr. Sabio reported 5/5 motor strength and full range motion in the bilateral upper and lower extremities, and full range of motion in the spine. In this regard, the ALJ noted that, while the work related limitations reported by Dr. Sabio are generally consistent with the ALJ's residual functional capacity assessment, Dr. Sabio's conclusions that Claimant was disabled "from all full work activity is refuted by his own findings on physical examination." (Tr. 28).

The ALJ also considered Claimant's demonstrated daily activities, which were consistent with sedentary work. (Tr. 27-28). In September 2002, Claimant told Dr. Sabio that he could walk for 300 yards. (Tr. 162). In January 2003, Dr. Sabio noted that Claimant had been out sweeping snow. (Tr. 160). In December 2003, Claimant reported that he enjoyed hunting with his friends. (Tr. 237). Claimant also stated that he drives thirty-five to forty miles in a typical week, gets his own gas, goes to the store for his medication and feeds his dog. (Tr. 105, 288, 298). Moreover, Claimant does not require help with his personal needs or grooming. (Tr. 103). He vacuums, dusts furniture, does some lawn care, washes dishes, takes trash out and prepares his meals, although his sisters provide some help with meal preparation and cleaning. (Tr. 104, 307).

Claimant cites § 404.1527(d)(2) for the proposition that the ALJ failed to account for the factors set forth in § 404.1527(d). Claimant, however, does not cite Fourth Circuit case law indicating that there are circumstances under which an ALJ must explicitly discuss each of the section 404.1527(d) criteria. In the instant case, although the ALJ did not explicitly and specifically reference the factors enumerated in § 404.1527(d) with reference to Dr. Sabio's opinion, he did discuss some of the relevant factors in narrative form. Additionally, the ALJ summarized almost the entire medical record before him. (Tr. 22). The ALJ then properly determined that the opinion of Dr. Sabio was not entitled to great weight. (Tr. 28).

Accordingly, the ALJ properly evaluated the medical opinion evidence of Dr. Sabio.

## 2. THE ALJ FAILED TO PROPERLY EVALUATE AND WEIGH THE REPORT OF MR. MORRELLO.

Claimant maintains that the ALJ erred by failing to properly evaluate and weigh the psychological report of Mr. Morrello. Commissioner counters that the ALJ properly evaluated the opinion of Mr. Morrello.

Claimant asserts that the ALJ failed to weigh Mr. Morrello's report as mandated by 20 C.F.R. § 404.1527(d).[5] Although the ALJ did not explicitly and specifically reference the factors enumerated in § 404.1527(d) with reference to Mr. Morrello's opinion, he did discuss some of the relevant factors in narrative form. In his decision, the ALJ noted that Mr. Morrello examined Claimant on referral from Claimant's counsel. The ALJ, who declined to accept Mr. Morrello's assessment, stated that: "[w]hile the hired consultative psychologist reported 'marked' limitations in functioning, which if accepted would render the claimant disabled, little weight can be afforded his assessment due to its lack of support in the record." (Tr. 26). The ALJ noted that Claimant had no history of mental health treatment and takes no prescribed medications for treatment of depression or anxiety. The ALJ further noted that Dr. Sabio never diagnosed , referred or treated Claimant for a mental impairment. (Tr. 26). Therefore, the ALJ correctly observed that there was little support in the record for the limitations found by Mr. Morrello. (Tr. 26).[6]

3. THE ALJ FAILED TO CONSIDER OBESITY AS A SEVERE IMPAIRMENT.

Claimant asserts that the ALJ failed to incorporate obesity as Claimant's impairment and

---

[5] The five factors to be considered under 20 C.F.R. § 404.1527(d) are: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.

[6] Claimant also contends that the ALJ's determination of his RFC was error because the ALJ did not perform a function-by-function analysis pursuant to SSR 96-8p. It is the duty of the ALJ to resolve conflicts in the evidence; whereas it is the duty of this Court to determine whether the Commissioner's findings are supported by substantial evidence. Hays, 907 F.2d at 1456.
In making his RFC determination, the ALJ took into account those limitations for which there was record support. Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary. See SSR 96-8p. Accordingly, the ALJ's hypothetical to the Vocational Expert incorporated Claimant's limitations that are supported by the record.

did not evaluate the effect of obesity in combination with other impairments. Commissioner counters that the ALJ did not err because Claimant did not allege obesity as a basis for disability on his application.

According to the Social Security Rules, obesity, as other medical impairments, will be deemed a "severe" impairment, "when alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." SSR 02-01p. In determining whether a claimant's obesity is a severe impairment, an ALJ must "do an individualized assessment of the impact of obesity on an individual's functioning." Id.

The ALJ did not err in concluding that Claimant's impairments did not meet or equal a listing impairment. As obesity is not a separately listed impairment, a claimant will be deemed to meet the requirements if "there is an impairment that, in combination with obesity, meets the requirements of a listing." SSR 02-01p. Equivalence may also be determined if a claimant has multiple impairments, including obesity, none of which meets the listing requirement, but which when viewed in the aggregate are equivalent to a listed impairment. See id. The Rule, however, explains that:

> [An ALJ] will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. [The ALJ] will evaluate each case based on the information in the case record. Id. (emphasis added).

Although Claimant contends that the ALJ erred in not considering obesity in determining whether he meets or equals a listing impairment, he does not specify which listing he believes he meets or equals. Further, he does not set forth any evidence which would support the diagnosis

and findings of a listed impairment. 20 C.F.R. 404.1525(d). Although Claimant states that "[t]his argument is self-evident," the U.S. Supreme Court has held that a claimant carries the initial burden of proving a disability. See 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983). In this case, Claimant did not list obesity as an impairment when he filed his application for benefits (Tr. 45, 47), requested reconsideration (Tr. 46, 51), completed his disability report (Tr. 108) or prepared his statement prior to the administrative hearing. (Tr. 112). Additionally, the record does not indicate that Claimant had functional limitations associated with obesity that would preclude him from working or that Claimant's obesity exacerbated his other impairments. For example, Dr. Sabio did not include obesity among his diagnoses during his evaluation in February 2003. (Tr. 136, 138). Nor did he mention or refer to obesity when he performed functional capacity assessment in February 2004. (Tr. 260-266).

Accordingly, the Court finds that the ALJ did not error by not incorporating Claimant's obesity as a severe impairment.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ (1) properly evaluated and weighed the opinion of Claimant's treating physician; (2) properly evaluated and weighed the opinion of Mr. Morello, a consulting psychologist; and (3) properly considered Claimant's obesity

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten

(10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: April 25, 2006

 /s/ James E. Seibert                                      
JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE